O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MJC SUPPLY, LLC and MJC AMERICA, LTD., | ) CV 18-01265 RSWL-SK |
| Plaintiffs, | ) **Order re: Plaintiffs' Motion for Partial Summary Judgment [36]; Defendant's Motion for Summary Judgment [38]** |
| v. | ) |
| SCOTTSDALE INSURANCE COMPANY, and DOES 1 to 50, inclusive, | ) |
| Defendants. | ) |

Plaintiffs MJC Supply, LLC and MJC America, Ltd. (collectively "Plaintiffs" or "MJC") brought this Action against their insurer, Scottsdale Insurance Company ("Defendant"), regarding an insurance coverage dispute. The Action arises out of Defendant's alleged breach of three insurance policies (collectively, the "Policies") that were triggered in response to two underlying lawsuits brought against Plaintiffs and some of their officers or directors. Currently before the Court is Defendant's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("Defendant's

1

Motion"), and Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion"). For the reasons set forth below, Defendant's Motion is **GRANTED** in part and **DENIED** in part, and Plaintiffs' Motion is **GRANTED** in part and **DENIED** in part.

## I. Background

### A. **Factual Background**

#### 1. The Parties

Plaintiff MJC Supply, LLC ("MJC Supply") is a California corporation. Compl. ¶ 1, ECF No. 1-2. Plaintiff MJC America, Ltd. ("MJC America") is a California limited liability company. Id. ¶ 2. Jimmy Loh and Charley Loh (collectively, the "Lohs"), and Simon Chu ("Chu") were officers or directors of Plaintiffs during the relevant period. See Pls.' Mot., Decl. of Charley Loh ¶ 19, ECF No. 36-2.

#### 2. The Policies

Defendant issued three Business and Management Indemnity policies at issue in this Action: Policy No. EKS3095392, to MJC Supply (the "MJC Supply Policy"); Policy No. EKS3095389 to MJC America (the "MJC America Policy"); and Policy No. EKS3095391 to Gree USA, a joint venture (the "Gree USA Policy"). Pls.' Resp. to Def.'s Stmt. Uncontroverted Facts & L. ("SUF") 1, ECF No. 48; Def.'s Mot., Exs. A-C, ECF Nos. 42-1. Other than the policy number and the identity of the named insureds, the three Policies are identical. See Def.'s

Mot., Exs. A-C.

The Policies were effective for the period of May 2, 2013 to May 2, 2014 (the "Policy Period").  The Policies' "Insureds" include Plaintiffs and their directors and officers.  Id., Ex A at SIC 3396; id., Ex. B at SIC 2727; id., Ex. C at SIC 2362.  Pursuant to the Policies' insuring clauses, Defendant is required "to pay the Loss" of Plaintiffs or their directors and officers, for which Plaintiffs or the directors or officers "have become legally obligated to pay by reason of a Claim first made against [them] during the Policy Period" and "reported to [Defendant] . . . for any Wrongful Act taking place prior to the end of the Policy Period".  Def.'s Mot., Ex A at SIC 3395; id., Ex. B at SIC 2726; id., Ex. C at SIC 2361.  A "Loss" means "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court and Costs, Charges and Expenses incurred by Directors and Officers . . . or the Company", but does not include, among other things, "any amount for which the insured is not financially liable or legally obligated to pay . . . ."  Id., Ex A at SIC 3396; id., Ex. B at SIC 2727; id., Ex. C at SIC 2362.  A "Claim" includes, among other things: (a) "a written demand against any Insured for monetary damages or non-monetary or injunctive relief;" (b) "a written demand by one or more of the securities holders of the Company upon the board of directors or the

management board of the Company to bring a civil proceeding against any of the Directors and Officers on behalf of the Company;" and (c) "a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading". A "Wrongful Act" includes "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by" the company or its directors or officers, while acting in their capacity as such. _Id._, Ex A at SIC 3397; _id._, Ex. B at SIC 2728; _id._, Ex. C at SIC 2363. "Costs, Charges and Expenses" include:

> a. reasonable and necessary legal costs, charges, fees and expenses incurred by any of the Insureds in defending Claims and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability

> b. reasonable and necessary legal costs, charges, fees and expenses incurred by any of the Insureds in investigating a written demand, by one or more of the securities holders of the Company upon the board of directors or the management board of the Company, to bring a civil proceeding against any of the Directors and Officers on behalf of the Company.

Def.'s Mot., Ex A at SIC 3395-96; _id._, Ex. B at SIC 2726-27; _id._, Ex. B at SIC 2361-62. The Policies exclude from coverage any Claim:

> e. brought or maintained by, on behalf of, in the right of, or at the direction of any Insured in any capacity, any Outside Entity

4

> or any person or entity that is an owner of or joint venture participant in any Subsidiary in any respect whether or not collusive, unless such Claim:
>
> i. is brought derivatively by a securities holder of the Parent Company and is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation of, or intervention of, any insured . . . .

("Insured vs. Insured Exclusion") Id., Ex A at SIC 3398; id., Ex. B at SIC 2729; id., Ex. B at SIC 2364.

### 3. The Underlying Actions

#### a. *Joint Venture Gree USA*

The instant Action is premised upon Defendant's handling of two underlying lawsuits, both of which concerned disputes regarding a joint venture, Gree USA Inc. ("Gree USA"). See generally id., Ex. D ("Federal Action Compl."), ECF No. 42-1; id., Ex. F ("State Action FAC"), ECF No. 42-2; id., Ex. G ("Federal Action Counterclaim"), ECF No. 42-2. Gree USA was owned 49% by MJC America, Holdings Co., Inc. ("MJC Holdings"),[1] and 51% by Hong Kong Gree Electrical Appliances Sales Ltd. ("Gree HK"), a subsidiary of Gree Electric Appliances, Inc. of Zhuhai ("Gree China"). Federal Action Compl. ¶ 2; State Action FAC ¶¶ 25-26. Gree USA

---

[1] MJC America, Holdings Co., Inc. is not a party to the instant Action. However in both the underlying lawsuits and the instant Action, the parties' often refer generally to "MJC", which encompasses MJC Holdings, as well as the Plaintiffs in this Action, MJC Supply and MJC America. The Court similarly refers to MJC Holdings, MJC Supply, and MJC America collectively as "MJC".

was formed to market and distribute products manufactured by Gree China, including air conditioners and dehumidifiers, in the United States.  Federal Action Compl. ¶ 2; State Action FAC ¶ 27.

The following individuals were officers or directors of Gree USA during the relevant period: Dong Mingzhu ("Mingzhu") was a member of the board of directors and chairperson for Gree USA.  Def.'s SUF ¶ 31.  Jian Chen ("Chen") was the chief financial officer ("CFO") for Gree USA.[2]  Id. ¶ 32.  Jimmy Loh was on the board of directors of Gree USA and the chief executive officer ("CEO") of Gree USA.  Id. ¶ 33.  Charley Loh was on the board of directors of Gree USA.  Id. ¶ 34. Simon Chu was an officer of Gree USA.  Def.'s Mot., Ex. FF, Dep. of Simon Chu 14:6-15, ECF No. 42-4.

b.  *Federal Action*

On June 13, 2013, MJC America and MJC Holdings filed a lawsuit against Gree China and Gree HK in the United States District Court for the Central District of California (the "Federal Action").  See Federal Action Compl.  MJC America and MJC Holdings were represented by Winston & Strawn LLP ("Winston Strawn"). See id.  The Federal Action alleged that in July 2012, MJC America learned that dehumidifiers sold by Gree USA were catching fire.  Id. ¶ 4.  MJC America and MJC

---

[2] The parties dispute whether Jian Chen was also a member of the board of directors of Gree USA.

Holdings indicated that they informed Gree China of these issues, and told them that they would inform the Consumer Product Safety Commission and possibly issue a recall. Id. at ¶¶ 5-6. MJC America and MJC Holdings alleged that in response, Gree China engaged in a campaign to financially destroy MJC America, MJC Holdings, and Gree USA. Id. at ¶ 7.

On February 10, 2014, Gree China and Gree HK filed a counterclaim (the "Federal Action Counterclaim") against MJC America, MJC Supply, MJC Holdings, and several of their officers or directors including Charley Loh, Jimmy Loh, and Simon Chu.[3] Def.'s SUF ¶ 17; Federal Action Counterclaim. The Federal Action Counterclaim is premised upon allegations of Plaintiffs' and their officers or directors misconduct in managing Gree USA. See generally Federal Action Counterclaim. Specifically, the Federal Action Counterclaim asserts claims for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with prospective economic advance, and violation of California Business & Professions Code §§ 17200 et seq. Id. It is undisputed that the Federal

---

[3] Gree China and Gree HK subsequently filed two amended counterclaims, one on March 3, 2014 and one on May 28, 2014. The Court refers to the Federal Action Counterclaim and its amendments collectively as the "Federal Action Counterclaim".

Action Counterclaim alleged a "Wrongful Act" against "Insureds" under all three Policies.  Pls.' SUF ¶ 15.

c.  *State Action*

On June 25, 2013, Gree HK filed a lawsuit on its own behalf and derivatively on behalf of Gree USA against MJC Supply, Charley Loh, and Jimmy Loh in Los Angeles Superior Court.  See State Action Compl.  Gree HK also sued Gree USA as a nominal defendant.  Id. Gree HK then twice amended its Complaint, adding MJC America and Simon Chu as defendants and asserting new causes of action.  See Def.'s Mot., Ex. F, ECF No. 42-2; Pls.' Opp'n, Ex. 23, ECF No. 47-4; Pls.' Reply, Ex. 47, ECF No. 58-2.  Neither party disputes that the State Action alleged a "Wrongful Act" as defined in the Policies.  Pls.' SUF ¶ 14.  Specifically, among other things, Gree HK alleged that the Lohs opened a separate account at Bank of America that only they had access to.  State Action FAC ¶¶ 45-46.  The State Action FAC alleges that Jian Chen, CFO of Gree USA, did not have access to the separate account, and that while he was on vacation, the Lohs fabricated invoices from MJC Supply and issued those invoices to Gree USA.  Id. ¶ 60.  The FAC alleged that "none of the invoices were for legitimate debts owed by Gree USA to MJC Supply." Id. ¶ 61.  The FAC further averred that the Lohs also caused payments to be made by Gree USA to MJC Supply

for un-invoiced commissions, and that the total amount the Lohs wrongfully caused to be paid by Gree USA to MJC Supply was $28,622,320.81. <u>Id.</u> ¶¶ 63-64.

          d. *Settlement of State and Federal Actions*

The Federal Action proceeded to trial in April 2015, resulting in a $42.5 million Judgment in favor of Plaintiffs and their officers or directors. Def.'s SUF ¶ 46; Def.'s Mot., Ex. Q, ECF No. 43-3. Gree China appealed that Judgment. Def.'s SUF ¶ 47. While the appeal was pending, the MJC entities and Gree entities reached a global settlement (the "Settlement") that ended both the State and Federal Actions. Def.'s Mot., Ex. R (the "Settlement Agreement"), ECF No. 42-3.

    4. <u>Tender and Defense of the Underlying Actions</u>

In September 2013, notice of the State Action was emailed to Defendant. Pls.' Mot., Ex. 6; Def.'s Opp'n, Ex. KK at 10:1-10. On September 18, 2013, Defendant agreed to defend Gree USA's officers or directors in the State Action under the Gree USA Policy and appointed the law firm Arent Fox as counsel. Pls.' Mot., Ex. 7. On October 1, 2013, Defendant withdrew its defense under the Gree USA Policy due to the Insured vs. Insured Exclusion. Def.'s Mot., Ex. J. On October 16, 2013, Defendant's counsel sent a letter to Jimmy Loh reiterating Defendant's denial of coverage under the Gree USA Policy. Def.'s Mot., Ex. K. The

letter included a footnote stating "[t]his letter does not address coverage under any other policy issued by Scottsdale, including but not limited to any policies issued to MJC America, Ltd. or MJC Supply, LLC.  If you would like Scottsdale to evaluate this matter for coverage under any other policies, please submit this matter for coverage under those policies."  Id.

On February 18, 2014, Plaintiffs emailed Defendant notifying it of the Federal Action Counterclaim and flagging the MJC America and MJC Supply Policies. Def.'s Mot., Ex. L.  On April 1, 2014, Defendant's counsel sent a letter to Jimmy Loh, "as the authorized representative of MJC Supply, LLC," stating that Defendant agreed to accept the defense of the Federal Action Counterclaim subject to a reservation of rights, and appointed the law firm of Ropers Majeski Kohn & Brently, PC ("Ropers") as defense counsel.  Def.'s Mot., Ex. M, ECF No. 42-2; Pls.' SUF ¶ 32.

On April 30, 2014, Plaintiffs' personal counsel, Peter Hwu, sent a letter to Defendant and Defendant's counsel clarifying that his clients were tendering both the State Action and Federal Action Counterclaim under all applicable Policies issued by Defendant, including the Gree USA, MJC Supply, and MJC America Policies. Def.'s Mot., Ex. N, ECF No. 42-2.  On May 27, 2014, Defendant agreed to defend the State Action under the

MJC Policies subject to a reservation of rights.
Def.'s Mot., Ex.O, ECF No. 42-2.

###### 5. Winston Strawn's Representation of Plaintiffs

Throughout the litigation of the State and Federal Actions, Winston Strawn served as counsel for Plaintiffs and their officers or directors. Def.'s SUF ¶ 44. Winston Strawn filed the Federal Action on behalf of MJC, and prosecuted MJC's affirmative claims against Gree China in that Action as well as in the State Action. Id. Winston Strawn also participated in MJC's defense of the State Action and the Federal Action Counterclaim. Id. Winston Strawn was selected as counsel by MJC. Id.

## B. Procedural Background

On November 1, 2017, Plaintiffs filed their Complaint [1-2] in this Action, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing. On February 15, 2018, Defendant removed the Action to this Court [1] on the basis of diversity jurisdiction. On April 9, 2019, Plaintiffs filed their Motion for Partial Summary Judgment [38] and Defendant filed its Motion for Summary Judgment [38]. Each party timely filed their Oppositions [47; 52] and Replies [58; 63] to the respective Motions. The Court took the Final Pretrial Conference under submission on May 31, 2019. Trial is

set for June 18, 2019.

**II. Discussion**

**A. Legal Standard**

  1. Summary Judgment

  Federal Rule of Civil Procedure 56(a) states that a "court shall grant summary judgment" when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" for purposes of summary judgment if it might affect the outcome of the suit, and a "genuine" issue exists if the evidence is such that a reasonable fact-finder could return a verdict for the nonmovant. Anderson, 477 U.S. at 248. The evidence, and any inferences based on underlying facts, must be viewed in the light most favorable to the nonmovant. Twentieth Century-Fox Film Corp. v. MCA, Inc., 715 F.2d 1327, 1328-29 (9th Cir. 1983). In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, but only to determine if a genuine issue of material fact exists. Anderson, 477 U.S. at 255.

  Where the nonmovant bears the burden of proof at trial, the movant need only prove that there is no evidence to support the nonmovant's case. In re Oracle Corp. Secs. Litig., 627 F.3d 376, 387 (9th Cir. 2010). If the movant satisfies this burden, the burden then

12

shifts to the nonmovant to produce admissible evidence showing a triable issue of fact.  Id.; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000); see also Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

### 2.  Partial Summary Judgment

Federal Rule of Civil Procedure 56 authorizes courts to grant partial summary judgment to limit the issues to be tried in a case.  State Farm Fire & Cas. Co. v. Geary, 699 F. Supp. 756, 759 (N.D. Cal. 1987) (citing Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981)); see, e.g., White v. Lee, 227 F.3d 1214, 1240 (9th Cir. 2000)("[A] court may award a partial summary judgment that decides only [the] issue [of liability].").  Absent special circumstances, partial summary judgment is not appealable prior to the entry of a final judgment because such orders do not dispose of all claims or end the litigation on the merits.  Williamson v. UNUM Life Ins. Co. of Am., 160 F.3d 1247, 1250 (9th Cir. 1998)(citations omitted).

## B.  **Analysis**

### 1.  Requests for Judicial Notice

#### a.  *Plaintiffs' RJN*

Plaintiffs filed two requests for judicial notice

(collectively, "Plaintiffs' RJN")[4] asking that the Court take judicial notice of the following court filings: (1) the Complaint filed in Los Angeles Superior Court Case No. KC066270; (2) a November 18, 2014 Order Denying Leave to Amend, filed in the Federal Action; (3) an Order Granting Motion for Protective Order Concerning the Deposition of Dong Mingzhu, filed in the State Action; (4) the State Action SAC; (5) the Second Amended Joint Pretrial Order, filed in the Federal Action; and (6) the Satisfaction of Judgment, filed in the Federal Action. Pls.' Req. for Judicial Notice, ECF No. 50. Defendant does not oppose Plaintiffs' RJN.

A district court may take judicial notice under Rule 201 of "undisputed matters of public record . . . including documents on file in federal or state courts." <u>Harris v. Cty. of Orange</u>, 682 F.3d 1126, 1131-32 (9th Cir. 2012). Here, each of the documents Plaintiffs request the Court take judicial notice of are on file with federal or state courts and the documents have a direct relation to the matters at issue in this case, because with the exception of the

---

[4] Plaintiffs' second Request for Judicial Notice, <u>see</u> ECF No. 59, simply repeats a Request made in their first Request for Judicial Notice, <u>see</u> ECF No. 50, for the Court to take notice of the State Action SAC. The only difference between the two Requests is the exhibit cited by Plaintiffs in support. Because the Requests ask the Court to judicially notice the same document, the Court combines the analysis and refers to the Requests collectively as "Plaintiffs' RJN".

first document, each of the documents were filed in the underlying State or Federal Actions, on which this case is premised.  See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (citations omitted) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").  As for the first document—the Complaint filed in Los Angeles Superior Court Case No. KC066270—even though the document was not filed in the Federal or State Actions, it is still sufficiently related to this case as it involves the same or similar parties and issues as those appearing in the State and Federal Actions.  As such, the Court **GRANTS** Plaintiffs' RJN.

  b.  *Defendant's RJN*

In Defendant's first two Requests for Judicial Notice (collectively, "Defendant's First RJN"),[5] it asks that the Court take notice of the following: (1) the Federal Action Complaint; (2) the State Action Complaint; (3) the State Action FAC; (4) the Federal

---

  [5] Defendant filed two identical Requests for Judicial Notice: one in support of its Motion for Summary Judgment, see ECF No. 43, and one in support of its Opposition to Plaintiffs' Motion for Partial Summary Judgment, see ECF No. 56.  Because the Requests are identical, the Court refers to them collectively as "Defendant's First RJN".

Action Counterclaim; (5) a Notice of Ruling Granting
MJC's Motion to Stay the Proceedings of the State
Action, filed in the State Action; (6) the Judgment in
favor of MJC, filed in the Federal Action; (7) a
Complaint filed by MJC against Winston Strawn (the
"Malpractice Action"); (8) an Order regarding Gree HK's
Application for Writs of Attachment and Motion for
Preliminary Injunction, filed in the State Action; (9)
a Declaration of Jimmy Loh in Support of MJC's
Opposition to Plaintiff's Motion for Preliminary
Injunction, filed in the State Action; and (10) the
Declaration of Michael Olson in support of Peter Hwu's
and Peter Hwu APC's Demurrer, filed in the Malpractice
Action.  See Def.'s Req. for Judicial Notice, ECF Nos.
43, 56.  Plaintiffs do not oppose Defendant's First
RJN.

Each of the documents identified by Defendant are
court filings and thus constitute undisputed matters of
public record.  See Harris, 682 F.3d at 1131-32.
Moreover, the documents are directly relevant to this
Action.  Each of the documents, except for the seventh
and tenth documents, were filed in the Underlying
Actions.  The seventh document—the Complaint filed in
the Malpractice Action—is related since Plaintiffs
brought the Malpractice Action against Winston Strawn,
alleging in part that Winston Strawn failed to timely

tender the State Action to Defendant.  See Def.'s Mot.,
Ex. T ¶ 15.   The tenth document—the Declaration of
Plaintiff's Attorney, Michael Olson, filed in the
Malpractice Action—is relevant because it directly
references the Complaint filed in this Action and
discusses its relation to the Malpractice Action.  See
Def.'s Mot., Ex. JJ, ECF No. 42-4.  In sum, because all
of the documents identified are public court filings
and directly relevant to this Action, and in light of
the fact that Plaintiffs did not file an opposition,
the Court **GRANTS** Defendant's First RJN.

Defendant's next Request for Judicial Notice
("Defendant's Second RJN") asks the Court to judicially
notice: (1) a declaration of Jian Chen in support of
Gree HK's *Ex Parte* Application for an Order Enforcing
TRO, filed in the State Action; and (2) a Supplemental
Declaration of Jian Chen in Support of Gree HK's Motion
for Preliminary Injunction, filed in the State Action.
See Def.'s Req. for Judicial Notice, ECF No. 63-1.
Plaintiffs also do not oppose Defendant's Second RJN.
For the same reasons as stated with respect to
Plaintiffs' RJN and Defendant's First RJN, the Court
**GRANTS** Defendant's Second RJN.

2.   Evidentiary Objections

Plaintiffs object to Defendant's Exhibit BB [42-4]
which contains excerpts from the deposition transcript

of Jian Chen, dated January 8, 2015, and Defendant's Exhibit CC [42-4] which contains excerpts from the deposition transcript of Dong Mingzhu, dated December 17, 2015. <u>See</u> Pls.' Evid. Objs., ECF No. 62. Defendant failed to provide a response. The Court does not rely on these excerpts in its analysis, and thus the Court **DENIES as MOOT** Plaintiffs' evidentiary objections.

   3.   <u>The Motions</u>

          a.   *Breach of the Gree USA Policy*

                 i.   *Statute of Limitations*

Defendant contends, for the first time, that Plaintiffs' claim for breach of the Gree USA Policy is barred by the four-year statute of limitations on breach of contract claims pursuant to California Code of Civil Procedure § 337(a). However, Defendant failed to raise the statute of limitations as an affirmative defense in its Answer, and thus cannot assert it now to bar Plaintiffs' claim. Fed. R. Civ. Proc. 8(c)(a) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . statute of limitations"); <u>Wood v. Milyard</u>, 566 U.S. 463, 470 (2012)(quotations omitted) ("Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in defendant's answer or in an amendment thereto."). Even if Defendant had properly

raised the statute of limitations as an affirmative
defense in its Answer, it still would not bar
Plaintiffs' claim because the underlying State Action
did not settle until 2016, less than one year before
Plaintiffs filed this Action, and in insurance cases
"the limitations period is equitably tolled from the
time the cause of action accrues—upon [an insurer's]
refusal to defend—until the underlying lawsuit is
terminated by a final judgment." Eaton Hydraulics Inc.
v. Continental Casualty Co., 34 Cal. Rptr. 91, 96 (Cal.
Ct. App. 2005). Thus, the statute of limitations does
not apply.

ii. *Failure to Obtain a Declaratory Order*

Plaintiffs argue that Defendant breached the Gree
USA Policy by withdrawing its defense without a court
order declaring that there is no duty to defend. See
Pls.' Mot. at 18:20-19:19. However, Plaintiffs cite no
authority to support the position that an insurer is
required to seek a judicial declaration before
withdrawing a defense. Instead, the well-established
rule is that an insurer's duty to defend arises upon
tender and "is discharged when the action is concluded
. . . [or] if it is shown that no claim can in fact be
covered." Buss v. Superior Court, 16 Cal. 4th 35, 46
(1997)(citations omitted). While an "insurer is well
advised to seek a judicial determination that it owes

19

no defense" in order to prevent subsequent liability for breaching the contract or bad faith, so long as the insurer can conclusively establish that no claim can be covered, it is under no legal obligation to do so. <u>Hartford Accident & Indemnity Co. v. Superior Court</u>, 29 Cal. Rptr. 2d 32, 35-36 (Cal. Ct. App. 1994). Thus, Defendant did not breach the Gree USA Policy by withdrawing its defense without a court order.

### iii. *Insured vs. Insured Exclusion*

Both parties seek summary judgment on the issue of whether Defendant breached the Gree USA Policy by withdrawing its defense on October 1, 2013 on the basis of the Insured vs. Insured Exclusion. <u>See</u> Def.'s Mot., Ex. J, October 1, 2013 Email Withdrawing Coverage, ECF No. 42-2. In order to find that Defendant did not breach its defense obligations, Defendant bears the burden of establishing that it had conclusive evidence at the time that it withdrew the defense, that the Insured vs. Insured Exclusion applies. <u>See</u> <u>Atlantic Mutual</u>, 123 Cal. Rptr. 2d at 272 ("An insurer may rely on an exclusion to deny coverage only if it provides *conclusive evidence* demonstrating that the exclusion applies."); <u>Amato v. Mercury Cas. Co.</u>, 61 Cal. Rptr. 2d 909, 913 (Cal. Ct. App. 1997) ("[T]he duty to defend is a continuing one which arises on tender of the defense and lasts either until the conclusion of the underlying

lawsuit or until the insurer can establish *conclusively* that there is no potential for coverage and therefore no duty to defend.").

The Insured vs. Insured Exclusion applies where a claim is brought or maintained by or at the direction of any Gree USA Director or Officer, while acting in any capacity, against other Gree USA Directors or Officers.  Def.'s Mot., Ex A at SIC 3398.  Directors and Officers include "any person who was, now is, or shall become: a duly elected or appointed director, officer, or similar executive of the Company, or any member of the management board of the Company; [and] a person who was, is or shall become a full-time or part-time employee of the Company".  Id. at SIC 3396.

Defendant contends that the State Action was brought and maintained by two Directors or Officers of Gree USA, Dong Mingzhu and Jian Chen, against MJC and two other Directors or Officers of Gree USA, Charley Loh and Jimmy Loh.  On October 1, 2013, Defendant informed the Lohs via email that it was denying coverage under the Gree USA Policy because it had "discovered" that the State Action was "brought by [Gree HK], at the direction of Dong Mingzhu, the CEO and Chairperson of Gree China and [Gree HK] and Jian Chen an officer of [Gree HK]."  Def.'s Mot., Ex. J.  However, nowhere in the October 1, 2013 email did

Defendant indicate how it made such discovery. Defendant's follow-up letter to Plaintiffs on October 16, 2013 was similarly vague, providing the following rationale for its application of the Insured vs. Insured Exclusion:

> Based on the information available to Scottsdale, it appears that the [State Action] was brought or maintained by, on behalf of, in the right of, or at the direction of Dong Mingzhu and Jian Chen, both of whom are Insureds under the Policy. To be sure, Dong Mingzhu is the Chairman and Chief Executive Officer of [Gree HK] and, therefore, the [State Action] was necessarily filed at h[er] direction. Moreover, Jian Chen, who appears to be a principal of [Gree HK], submitted the declarations in support of [Gree HK's] motions for a temporary restraining order and preliminary injunction in the [State Action].

Def.'s Mot., Ex. K, ECF No. 42-2. This letter does not establish that Defendant had conclusive evidence that the Insured vs. Insured Exclusion applied when it withdrew the defense. First, the letter suggests that Defendant may have simply made the inferential leap that as the Chairwoman and CEO of Gree HK,[6] the State Action was necessarily filed at Mingzhu's direction. Id. However, Defendant fails to cite evidence of Mingzhu's actual involvement in the State Action, and fails to cite authority supporting the position that a lawsuit filed by a corporation is necessarily brought

_____

[6] Defendant refers to Mingzhu as the CEO of Gree HK but fails to cite any evidence supporting this fact. Instead, the only evidence provided establishes that during the relevant Mingzhu was CEO of Gree HK's parent corporation, Gree China.

or maintained by the corporation's Chairwoman or CEO.[7] Second, Defendant relies on two declarations submitted by Chen in support of Gree HK in the State Action to argue that Chen assisted in the litigation. See Def.'s Reply, Ex. LL, ECF No. 63-3; id., Ex. MM, ECF No. 63-4. However, at this juncture, the issue is not whether Chen assisted in the litigation, but rather, whether he brought or maintained the litigation.[8] While the declarations may ultimately be relevant in determining whether Chen was involved in maintaining the State Action, they are not determinative. As such, the allegation that "Jian Chen, who appears to be a principal of [Gree HK], submitted the declarations in

---

[7] Defendant cites to a Declaration of Jimmy Loh submitted by Plaintiffs in the State Action, in which he indicated that on information and belief, Mingzhu was the Chairwoman of Gree HK and the CEO of Gree China, a corporation which had over 80,000 employees, and that Mingzhu "ma[de] all executive decisions for Gree HK and Gree China with respect to Gree USA and that Jian Chen, the CFO of Gree USA, operate[d] at her direction." Def.'s Mot., Ex. AA ¶ 9. However, even assuming the truth of these statements—which itself is questionable given that Jimmy Loh did not work for Gree HK or Gree China—they do not show that the State Action was filed at Mingzhu's direction.

[8] Defendant attempts to point to these declarations to show that assuming the Exclusion applies, Chen's assistance precludes a finding that the exception to the Exclusion applies. An exception to the Insured vs. Insured Exclusion provides that coverage will not be excluded if an action is brought derivatively, and totally without the assistance, active participation, or intervention of any Insured. See id., Ex A at SIC 3398. Because the Court finds that there is a question of fact as to whether the Exclusion is triggered in the first place, the Court need not address the exception to the Exclusion.

support of [Gree HK]" is insufficient to establish that Defendant had conclusive evidence at the time that it withdrew its defense under the Gree USA Policy that the Insured vs. Insured Exclusion applied.

At the same time, Plaintiffs have not shown that there is no triable issue as to whether Defendant lacked conclusive evidence on October 1, 2013 that the Insured vs. Insured Exclusion applied. The October 16, 2013 email reveals that Defendant at least made some investigation of the facts to determine whether coverage was excluded, as it purported to have knowledge of Mingzhu and Chen's roles with respect to the Gree entities, and was aware of certain developments in the State Action, such as Chen's declarations. Further, Chen's declarations show evidence of his involvement in and approval of the State Action, and may be indicative that he played an even larger role in the litigation by bringing or maintaining the State Action. See Def.'s Reply, Ex. LL; id., Ex. MM. Moreover, as alleged in the State Action, Gree HK believed that it had appointed Mingzhu, Chen, and Zhang Zhenghu as directors to Gree USA. State Action SAC ¶ 32. Given that Mingzhu was a director of Gree USA and Chen was the CFO of Gree USA (and also potentially one of three Gree USA directors elected by Gree HK), it is hard to imagine that Mingzhu

and Chen did not have a significant role in maintaining the State Action, which was in part brought derivatively on behalf of Gree USA.  Thus, a genuine issue exists as to whether Defendant had conclusive evidence on October 1, 2013 that the Insured vs. Insured Exclusion applied.  As such, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment as to Defendant's breach of the Gree USA Policy, and **DENIES** Defendant's Motion for Summary Judgment as to its non-breach of the Gree USA Policy.

### b.  *Breach of the MJC Policies*

#### i.  *Failure to Provide Immediate Defense*

Both parties move for summary judgment on the issue of whether Defendant owed a duty to defend Plaintiffs under the MJC Policies when it first received notice of the State Action, in connection with the Gree USA Policy, in September 2013.  It is well-settled that "the duty to defend arises as soon as tender is made." Montgomery Ward & Co., Inc. v. Imperial Cas. & Indem. Co., 97 Cal. Rptr. 2d 44, 54 (Cal. Ct. App. 2000).  In order for an insured to "tender" a claim under the Policies, an insured must "give Insurer written notice of any Claim as soon as practicable, but in no event later than sixty (60) days after the end of the Policy Period."  Def.'s Mot., Exs. A-C Section E(1).

Plaintiffs' insurance agent and broker, Victor Louie, emailed Defendant notifying it of the State Action in September 2013.[9]  See Def.'s Mot., Ex. H; Def.'s Opp'n, Ex. KK, Deposition of Victor Louie 7:14-23.  The email's subject line read "Claim Submission - Policy #EKS 3095391 - Gree USA".  Def.'s Mot., Ex. H. Because the notice specifically identified only the Gree USA Policy, Defendant believes it was not required at that point to also evaluate whether coverage was available under the MJC Policies.  However, nowhere in the Policies is there a requirement that an insured specifically identify the Policy it intends to make a claim under when notifying Defendant of a claim.  In fact, the Policies suggest the opposite:

> If during the Policy Period . . . any of the Insureds first becomes aware of specific facts or circumstances which may reasonably give rise to a future Claim covered under this Policy, and if the Insureds, during the Policy Period . . . give written notice to Insurer as soon as practicable of: [a] a description of the facts, circumstances, or allegations anticipated; [b] the identity of potential claimants; [c] the circumstances by which the Insureds first became

---

[9] The parties dispute whether notice of the State Action was first provided to Defendant on September 5 or September 17. Plaintiffs attach a copy of a September 5, 2013 email sent by Victor Louie to a Richard Gelok, "the general agent at Swett", informing Gelok of the State Action and asking him to forward the claim to Defendant.  See Pls.' Mot., Ex. 6; Pls.' Opp'n, Ex. 23. However, neither party indicates what Swett is, how it is related to this Action, and whether notice to the general agent of Swett constitutes notice to Defendant.  As such, a triable issue of fact exists as to whether Defendant was notified of the State Action on September 5 or September 17.

> aware of the facts or circumstances; [d] the identity of the Insureds allegedly involved; [e] the consequences which have resulted or may result; and [f] the nature of the potential monetary damages and non-monetary relief; then any Claim made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notices was received by the Insurer.

Def.'s Mot., Exs. A-C Section E(2). Plaintiffs provided all of the aforementioned information to Defendant via email in September 2013. See Def.'s Mot., Ex. H. Specifically, the email contained a copy of the State Action Complaint and the Answer to the Complaint, from which it was evident that a "Wrongful Act" was being alleged against the Lohs, who were insureds under all three Policies. See generally Def.'s Mot., Ex. E; id., Ex. F. Once this information was provided to Defendant, Defendant was at least aware of the potential for liability under the MJC Policies. See Samson v. Transamerica Ins. Co., 30 Cal. 3d 220, 239 (1981) ("The insurance company's obligation to defend arises when it . . . learns of even the potential for liability under its policy."). Further, Defendant must have been aware that Gree USA, MJC Supply, and MJC America were related entities, such that any one of the three Policies may apply, since the State Action Complaint identified the connections between them as the foundation for Gree HK's claims, and the Answer revealed that Winston Strawn was

representing all of the insureds.[10]  As such,

Plaintiffs' email providing notice under the Gree USA

Policy was sufficient to trigger notice under all of

the Policies.  See Scottsdale Ins. Co. v. MV Transp.,

36 Cal. 4th 643, 655 (2005)("If any facts stated or

fairly inferable in the complaint, or otherwise known

or discovered by the insurer, suggest a claim

potentially covered by the policy, the insurer's duty

to defend arises and is not extinguished until the

insurer negates all facts suggesting potential

coverage.").

Moreover, even if the Policies required an insured

to identify a specific Policy number in connection with

a claim, Plaintiffs' error in only flagging the Gree

USA Policy at least put Defendant on "constructive

notice" that the MJC Policies could apply.  See

California Shoppers, Inc. v. Royal Globe Ins. Co., 221

Cal. Rptr. 171, 188-89 (Cal. Ct. App. 1985)("In the

aggregate, this represents a classic case of

constructive notice which raised the contractual duty

---

[10] Even without reading the State Action Complaint or
Answer, Defendant must have known that Gree USA, MJC Supply, and
MJC America were interconnected since each Policy referenced the
other two Policies in the "Tie-In Limits Endorsement" Section,
which, as will be described in greater detail, provided an
aggregate limit on Defendant's liability for any claim arising
out of "Interrelated Wrongful Acts" which would, in whole or in
part, be covered under more than one of the Policies.  See Def.'s
Mot., Exs. A-C, Tie-In Limit Common Claim Endorsement.

28

to defend.  In other words, given the appropriate circumstances, the law will charge a party with notice of all those facts which he might have ascertained had he diligently pursued the requisite inquiry."); Safeco Ins. Co. of Am. v. Parks, 88 Cal. Rptr. 730, 743 (Cal. Ct. App. 2009) (finding it was "unreasonable for [insurer] not to search for other policies it had issued after conclud[ing] that there was no coverage under [one of the] polic[ies]").  Thus, irrespective of whether Defendant believed coverage was available for the State Action under the Gree USA Policy, Defendant had an obligation to investigate the facts and determine whether coverage was possible under the related MJC Policies.

Defendant argues that it complied with its obligations because it invited Plaintiffs to tender the State Action under the MJC Policies on two occasions. Specifically, on October 16, 2013, Defendant's coverage counsel sent an eight-page letter to Jimmy Loh reiterating Defendant's denial of coverage under the Gree USA Policy.  See Def.'s Mot., Ex. K.  On the fifth page of the letter, Defendant's counsel included a footnote in small font stating: "[t]his letter does not address coverage under any other policy issued by Scottsdale including but not limited to any policies issued to MJC America Ltd. or MJC Supply, LLC.  If you

would like Scottsdale to evaluate this matter for coverage under any other policies please submit this matter for coverage under those policies." Id. Defendant made a similar offer again on April 1, 2014, in a letter to Plaintiffs regarding Defendant's coverage of the Federal Action Counterclaim. See Def.'s Mot., Ex. M. However, if anything, these footnotes reveal that Defendant was aware that the MJC Policies may have provided coverage for the insureds. See Gray v. Zurich Ins. Co. 65 Cal. 2d 263, 275 (1966)("[T]he carrier must defend a suit which *Potentially* seeks damages within the coverage of the policy . . . ."). Defendant fails to cite authority for its position that these footnotes should enable it to escape liability for failing to immediately defend a potentially covered claim. Instead, the weight of authority suggests that an insurer must defend a suit when it learns of the potential that the suit may be covered under a policy, and "[a]ny doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." Haskel, Inc. v. Super. Ct., 39 Cal. Rptr. 2d 520, 525 (Cal. Ct. App. 1995) (citations omitted). Given that Defendant had notice of the State Action and the potential for coverage under all three Policies as of September 2013, Defendant breached its duty to provide an immediate defense when it withdrew

coverage for the State Action on October 1, 2013. Thus, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment as to this claim.

## ii. *Failure to Pay All Costs*

Plaintiffs contend that even when Defendant provided Plaintiffs with a defense for the State and Federal Actions under the MJC Policies, it still breached its contractual obligations by not paying all of the "Costs, Charges, and Expenses" incurred by Plaintiffs, and as a result, Plaintiffs paid $311,806.02 in costs that should have been covered by Defendant. See Decl. of Charley Loh ISO Pls.' Opp'n ¶ 24, ECF No. 47-2. Defendant responds that it rightfully withheld payment for a portion of the costs because it was only responsible for costs incurred by Plaintiffs in defending claims, but not for the costs associated with Plaintiffs' prosecution of claims.

"Costs, Charges and Expenses" are defined in the Policies as "reasonable and necessary legal costs, charges, fees and expenses incurred by any of the Insureds in *defending* Claims . . . ." Def.'s Mot., Exs. A-C (emphasis added). The "Allocation Provision" added to the General Terms and Conditions Section of the Policies, instructs the parties of what to do in the event that an insured incurs costs that are both

covered by the Policies (i.e. costs incurred in defending claims) and not covered by the Policies (i.e. costs incurred in prosecuting claims). Specifically the Allocation Provision states:

> In the event the Insurer has the duty to defend a Claim under any Coverage Section in which both Loss that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such Claim includes both covered and uncovered matters or because such Claim is made against both covered and uncovered parties, then: [a] this Policy shall pay one hundred percent (100%) of Costs, Charges and Expenses incurred by such Insured on account of such Claim; and [b] there shall be a fair and equitable allocation of any remaining loss incurred by such Insured on account of such Claim between covered Loss and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained.

Def.'s Mot., Exs. A-C, Allocation Provision. The Court does not interpret the Allocation Provision to require Defendant to pay 100% of incurred costs—irrespective of whether they were incurred in connection with the defense or prosecution of the Underlying Actions—as Plaintiffs contend. Instead, the language suggests that Defendant is required to pay 100% of the costs incurred on account of a "Claim" which Defendant has a "duty to defend". <u>Id.</u> In other words, Defendant is required to pay all costs associated with defending a covered claim. As for the costs associated with the insureds' prosecution of claims in the Underlying Actions, "there shall be a fair and equitable

allocation . . . between covered Loss and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained." Id.

Neither party produced evidence regarding how the allocation was decided. Nor do the parties identify the specific costs incurred by Plaintiffs, or the amounts withheld by Defendant. Plaintiffs reliance on Charley Loh's statement in his declaration that "[s]ometimes we paid half, sometimes one third, once we paid all the expense . . . ." and that "[t]he fees we paid totaled $311,806.02" is insufficient to establish that Defendant breached the Policies. Likewise, Defendant failed to cite any evidence to refute Plaintiffs' statement that Defendant continued to only pay a portion of the costs even after the affirmative claims were gone, or to support that a fair allocation was reached. As such, Defendant cannot establish as a matter of law that it did not breach the Policies. Because a triable issue exists as to the allocation, the Court **DENIES** Defendant's Motion and **DENIES** Plaintiffs' Motion as to this claim.

iii. *Loss from Settlement*

The parties next dispute whether Plaintiffs' settlement of the Underlying Actions for an amount less than the Judgment it received in the Federal Action constitutes a "Loss" under the Policies. Plaintiffs

argue that it does, and thus believe they are entitled to indemnity for the Settlement of up to $42.5 million.

The Policies define "Loss" as "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and Costs, Charges and Expenses . . . ." However, "Loss does not include: . . .(e) any amount for which the Insured is not financially liable or legally obligated to pay . . . ." Def.'s Mot., Exs. A-C. Here, Plaintiffs were not legally required to pay anything in the Settlement. Instead, the Settlement was structured such that Gree HK agreed to release its claims in the State Action and release roughly $28.6 million—$22,070,669.85 of which had been frozen by a Writ of Attachment and $6,551,650.96 of which were un-attached disputed funds—to the MJC parties. Def.'s Mot., Ex. R. In exchange, the MJC parties agreed to set aside the $42.5 million bonded Judgment from the Federal Action. See id.

Plaintiffs argue that the Settlement left Defendant with a "fortuitous windfall" and left its insureds with the loss because if the State Action had been tried and Plaintiffs won, they would have gotten the $28.6 million that Gree HK had tied up with their Writ of

Attachment[11] and the $42.5 million Judgment which was bonded pending Gree's Appeal, and if the State Action had been tried and Gree HK won, Defendant would have to pay the Policy limits up to the amount of the Judgment before there would be any setoff against Plaintiffs' Judgment. See Pls.' Opp'n at 26:14-20. Critically, however, Plaintiffs ignore the fact that the Federal Action was pending appeal while the Settlement was reached. Def.'s SUF ¶ 47. Thus, Plaintiffs cannot say with certainty that they would have been able to "setoff" a Judgment against them in the State Action with the $42.5 million Judgment from the Federal Action. See e.g. Krupnick v. Hartford Accident & Indemnity Co., 34 Cal. Rptr. 2d 39, 50 (Cal. Ct. App. 1994)(discussing how an insurer's decision to settle a case before judgment "derives from the insurer's educated gamble that it is probably cheaper to settle than to risk allowing the case against its insured to go to trial and judgment, especially if the judgment is likely to exceed policy limits."). Indeed, had Plaintiffs gambled by refusing to settle, it is possible that they could have ended up with a Judgment

---

[11] Plaintiffs claim that the entire $28.6 million was tied up with the Writ of Attachment but the Settlement Agreement shows that $22,070,669.85 constituted the Attached amount, and $6,551,650.96 was unattached. See Def.'s Mot., Ex. R.

against them in both the Federal and State Actions, in which they would owe amounts that would well exceed Policy limits.[12]

Moreover, even assuming Plaintiffs won the appeal in the Federal Action, that still does not mean they were legally obligated to pay anything in the Settlement, such that the Settlement could be considered a "Loss" under the Policies as Plaintiffs suggest. Cf. Block v. Golden Eagle Ins. Corp., 17 Cal. Rptr. 3d 13, 22 (2004) (finding that the policies at issue did not insure against a diminution in market value as a result of the property's environmental condition because such diminution in value does not constitute 'damages' within the meaning of the policies). At most Plaintiffs have established that they missed out on an opportunity to hedge their bets by trying the State Action to possibly win a second judgment in their favor. This is not a "Loss" as defined by the Policies. Because the Settlement was

---

[12] Further, Gree HK sought $41.7 million in the State Action and of this amount, $14,190,669.85 was sought as restitution. See Pls.' Opp'n at 28:3-10. Restitutionary damages are not compensable under the Policies. See Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1266 (1992)("It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired."). Thus, had the State Action been tried and a Judgment been entered in favor of Gree HK, Plaintiffs would have been personally on the hook for at least $14,190,669.85.

not a "Loss", Defendant did not breach the Policies by failing to pay the difference between the amount of the Federal Action Judgment and the amount Plaintiffs' agreed to accept in the Settlement.[13]

iv. *Recovery in Excess of Policy Limits*

The Policies contain a Tie-In Limit Common Claim Endorsement, which provides the following:

> Notwithstanding the provisions of this Policy and the below listed policies [those listed to MJC Supply or MJC America and Gree USA] in respect of any Claim or more than one Claim which arises out of any Interrelated Wrongful Acts, which would, in whole or in part, be covered under this Policy and any of the below listed policies [those listed to MJC Supply or MJC America and Gree USA], the Limit of Liability of Insurer for all Loss incurred from all such Claims shall not exceed the sum of $2,000,000. It is further agreed that the allocation of covered Loss between these policies with respect to such Claim or Claims shall be made at the discretion of the Insurer.

Def.'s Mot., Exs. A-C, Tie-In Limit Endorsement. The term "Interrelated Wrongful Acts" is defined in the Policies as "all Wrongful Acts that have as a common nexus any facts, circumstance, situation, event, transaction, cause or series of facts, circumstances,

---

[13] To the extent that Plaintiffs believe that they were ill-advised to enter in the Settlement Agreement, that is an issue more appropriately suited for an action against the attorneys who structured the Settlement and advised Plaintiffs in the Settlement, not the insurance company who covered the defense fees incurred by the attorneys in negotiating the Settlement.

situations, events, transactions or causes." Id.
Section B(6).

Interrelated wrongful act provisions encompass
claims that have a logical or causal connection. Bay
Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins.
Co., 5 Cal. 4th 854, 873 (1993). "California courts
have found multiple claims to be sufficiently related
where the underlying actions are in service of a
'single plan.'" Liberty Ins. Underwriters, Inc. v.
Davies Lemmis Raphaely Law Corp., 162 F. Supp. 3d 1068,
1076 (C.D. Cal. 2016) (finding that seven different
underlying cases constituted a single "claim" where
they all arose from a "single course of conduct"),
aff'd, 708 F. App'x 374 (9th Cir. 2017). However,
where claims are "so attenuated or unusual that an
objectively reasonable insured could not have expected
they would be treated as a single claim under [an
insurance] policy", they are not interrelated. Bay
Cities Paving & Grading, Inc., 5 Cal. 4th at 873.

Here, the Federal Action and State Action are not
so attenuated that an objectively reasonable insured
could not have expected them to be treated as a single
claim under the Policies. Plaintiffs even recognized
as much when they argued that the State Action should
be stayed pending resolution of the Federal Action
because the two are substantially similar. See Def.'s

Mot., Ex. P.  The state court agreed with Plaintiffs, finding that "[t]he Federal Action essentially involves the same subject matter and substantially identical parties as the State Action, i.e. MJC Entities are being sued in both actions for allegedly misappropriating funds from Gree USA."[14]  Id.  The gravamen of both the State Action SAC and the Federal Action Counterclaim is that despite Gree HK's and Plaintiffs' agreement to build Gree USA for the benefit of both parties, Plaintiffs engaged in consistent improper and fraudulent self-dealing, using its control over Gree USA in furtherance of a plan to benefit MJC and harm Gree HK.  See generally State Action SAC; Federal Action Counterclaim.  Plaintiffs do not contest that this theme predominates throughout the State and Federal Actions.  See e.g. Pls.' Opp'n at 29:4-6 ("Most of the claims raised in the Second Amended Complaint are founded on the alleged conversion of the $28.6 million in June 2013.").  Nonetheless, Plaintiffs

---

[14] The state court granted Plaintiffs' Motion to Stay contingent on the Federal court allowing Gree HK to amend its Federal Action Counterclaim to add the claims set forth in the State Action.  Def.'s Mot., Ex. P; Pls.' Resp. to Def.'s SUF ¶ 46.  The Federal court did not allow Gree HK to amend its Counterclaim to add the claims, so the contingency never happened.  Pls.' Ex. 25.  However, the Federal court denied the motion to amend not because the State Action and Federal Action were not substantially similar, but because the parties were not diligent in seeking leave to amend.  See id.

insist that the Tie-In Endorsement does not apply because the State Action SAC added a claim for loss on the sale of inventory, which does not arise out of same "Interrelated Wrongful Acts" as the other claims.[15]

The Court finds Plaintiffs' argument unpersuasive. First, facts regarding Gree HK's loss on the sale of

[15] Plaintiffs assert several other arguments, without elaboration, that the Court finds unpersuasive. First, Plaintiffs contend that referral to the allegations of the pleadings, rather than the known facts discerned from the jury findings, is not helpful given the juries rejection of Gree HK's claims. However, Defendant's duty to defend and obligation to indemnify Plaintiffs for covered Claims does not depend on the ultimate findings of the jury, but instead, is based on the allegations brought against Plaintiffs. Thus, it is appropriate for the Court to consider the allegations of the pleadings. Second, Plaintiffs argue that Defendant's arguments are moot because it relies on the claims brought against Plaintiffs in the State Action FAC, and does not evaluate the State Action SAC. However, the Court granted Plaintiffs' request to Judicially Notice the State Action SAC, and Plaintiffs reference the allegations made in the State Action SAC in its Opposition. Thus, the Court may also evaluate the State Action SAC in determining whether the Tie-In Endorsement applies. Third, Plaintiffs insist that the Tie-In Endorsement requires that there be a causal relationship between acts for them to be "Interrelated Wrongful Acts", and that if it is not interpreted as requiring a causal relationship it is ambiguous, but this argument was squarely rejected by the California Supreme Court in Bay Cities Paving & Grading, Inc., 5 Cal. 4th at 873, which held that the term "related" is not ambiguous and is broad enough to encompass "both logical and causal connections". Fourth, Plaintiffs allege that the State Action SAC also added a claim for loss related to unpaid invoices. However, the factual allegations relating to this claim were also raised in the Federal Action Counterclaim and thus there is no question that it arises out of "Interrelated Wrongful Acts". See Federal Action Counterclaim ¶¶ 100-01 ("MJC used its control of Gree USA to keep Gree USA from paying legitimate invoices submitted by Gree Hong Kong while working to ensure that invoices submitted by MJC Supply and other MJC affiliated entities were paid.").

inventory appear in less than 10 paragraphs of the 201 paragraphs in the State Action SAC, and account for $9 million of the roughly $41.8 million in damages sought by Greek HK. See generally State Action SAC. The rest of the State Action SAC involves facts and claims that are also present in the Federal Action Counterclaims (i.e. fabricated invoices, fraudulent conveyances, past-due payments for Gree product, and sabotage to Gree USA and Gree HK). See generally id. Second, the loss on sale of inventory claim is still related to the other claims that appear in the State Action SAC and Federal Action Counterclaim. Specifically, the State Action SAC alleges that the Joint Venture Agreement between Plaintiffs and Gree HK obligated Plaintiffs to use their best efforts to sell the inventory that Gree manufactured for MJC, and that as Gree HK's partner in Gree USA, MJC had a fiduciary duty to use its best efforts to sell the inventory. State Action SAC ¶ 109. The State Action SAC alleges that by not using their best efforts to sell the inventory, MJC breached their fiduciary duty and contractual obligation to Gree HK causing Gree HK $9,159,336 in financial loss. Id. ¶¶ 112-13, 105. In other words, Plaintiffs breached their obligations as officers of Gree USA, acting in their own self-interest to the detriment of Gree HK. This type of behavior underlies each of the other claims

asserted by Gree HK in both the State and Federal Actions, and serves Plaintiffs' overall plan of exploiting Gree USA for personal gain.  Cf. WFS Fin., Inc. v. Progressive Cas. Ins. Co., 232 Fed. Appx. 624, 625 (9th Cir. 2007)(finding that two claims were sufficiently related where "the suits were filed by two different sets of plaintiffs in two different fora under two different legal theories" because "the common basis for those suits was the [defendant's] business practice of permitting independent dealers to mark up [defendant's] loans."); Cont'l Cas. Co. v. Wendt, 205 F.3d 1258, 1264 (11th Cir. 2000)("Though clearly this course of conduct involved different types of acts, these acts were tied together because all were aimed at a single particular goal.  The fact that these acts resulted in a number of different harms to different persons, who may have different types of causes of action . . . does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract [where they] comprised a single course of conduct designed to promote investment in [the firm].").  Thus, even though the State Action SAC alleged a claim for loss on the sale of inventory, that does not change the fact that both the State Action and Federal Action arise out of "Interrelated Wrongful Acts".  As such, the Tie-In Limit Endorsement applies.

Despite the applicability of the Tie-In Endorsement, Plaintiffs contend that they are entitled to recover in excess of the Policy limits. Specifically, Plaintiffs believe that they are entitled to over $800,000 in attorneys' fees it paid to Winston Strawn to defend the State Action, and to $42.5 million that they gave up in the Settlement. The Court addresses each allegation in turn.

First, Plaintiffs seek to recover over $800,000 in attorney fees it paid to Winston & Strawn to defend the State Action because they are "post-tender" fees payable under the MJC Policies, and damages incurred as a result of Defendant's breach of the Gree USA Policy. "An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract." Comunale v. Traders & Gen. Ins. Co., 50 Cal. 2d 654, 660 (1958). Plaintiffs were forced to incur the costs of their own defense in the State Action between the time when Defendant withdrew coverage under the Gree USA Policy on October 1, 2013, until the time Defendant agreed to provide a defense under the MJC Policies on May 27, 2014. See

Def.'s Mot., Ex. O.  Thus, irrespective of whether these amounts exceed the Policy limits, Defendant is responsible for them.  See Archdale v. American Internat. Speciality Lines Ins. Co., 64 Cal. Rptr. 3d 632, 648-49 (Cal. Ct. App. 2007)("[P]olicy limits . . . do not restrict the damages recoverable by the insured for a breach of contract by the insurer.").

Defendant contends that it cannot be liable for the Winston Strawn fees because it did not consent to Winston Strawn and the Policies contain a provision which indicate that Defendant is not required to pay for fees incurred without its consent. See Def.'s Mot., Exs. A-C, Section F(3).  This provision is known as a no voluntary payment provision ("NVP"), which "California law enforces . . . in the absence of economic necessity, insurer breach, or other extraordinary circumstances."  Jamestown Builders, Inc. v. Gen. Star Indemnity Co., 91 Cal. Rptr. 2d 514, 516 (Cal. Ct. App. 1999).  Yet, "when the insured has requested and been denied a defense by the insurer . . . the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's expense."  Gribaldo, Jacobs, Jones & Assocs. v. Agrippina Versicherunges A., 3 Cal. 3d 434, 449 (1970);

Jamestown Builders, Inc., 91 Cal. Rptr. 2d at 517 ("The no-voluntary-payments provision is superseded by an insurer's antecedent breach of its coverage obligation.").  Thus, because the Court found that Defendant breached the MJC Policies by failing to immediately provide a defense, Plaintiffs were within their right to secure their own defense from October 1, 2013 until May 27, 2014 and Defendant is liable for the legal fees incurred as a resulwet thereof.[16]

Second, Plaintiffs seek recovery of the $42.5 million they gave up in the Settlement.  Plaintiffs

---

[16] In a last ditch effort to escape liability, Defendant cites five bullet points listing additional "barriers" to Plaintiff's efforts to recover the Winston Strawn fees and costs being claimed in this Action: (1) Plaintiffs misrepresent the amounts incurred by Winston Strawn in defending Plaintiffs in the Underlying Actions; (2) Plaintiffs fail to produce evidence that they actually paid the Winston Strawn fees; (3) a portion of the Winston Strawn fees claimed by Plaintiffs were incurred to prosecute Plaintiffs' affirmative claims, which are not covered under the Policies; (4) a portion of the Winston Strawn fees were incurred before Plaintiffs tendered the State and Federal Actions; and (5) a portion of the fees were incurred after the undisputed date on which Defendant agreed to defend Plaintiffs in the Underlying Actions.  See Def.'s Mot. at 18:7-19:4.  Defendant fails to point to the Winston Strawn invoices, or otherwise support these defense with any citations to the record or legal authority.  See Independent Towers of Washington v. Washington, 350 F.3d 925, 929 (9th Cir. 2003) ("The art of advocacy is not one of mystery.  Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court.").  Plaintiffs have satisfied their burden of establishing damages, as they must do in order to bring a breach of contract claim.  Because all of Defendant's defenses simply pertain to the amount of damages, rather than whether damages are permitted at all, the Court declines to address each bullet pointed defense.

suggest they were forced to enter into the Settlement because Ropers misrepresented that the remaining limits under the Policies were $350,000, which was insufficient to cover the costs of trying the State Action. Plaintiffs argue that this was a misrepresentation because there is a $1 million extra limit which would have been available to Plaintiffs because the company was unable to indemnify its officers. See Def.'s Mot., Exs. A-C, Business and Management Indemnity Policy Declarations (stating that in addition to the $2 million aggregate limit for all Loss, there exists an additional $1 million aggregate for all Loss incurred by the Directors and Officers of the Company for which the Company is unable to indemnify the Directors and Officers). However, in order for this additional limit to apply to Plaintiffs, there must be a "Loss" that the Directors and Officers are legally obligated to pay, and since neither MJC nor its Directors or Officers were legally obligated to pay anything in the Settlement, there was no such "Loss". Accordingly, even assuming that the Ropers firm did inform Plaintiffs that there was only $350,000 left on the Policy, this statement is not a misrepresentation.

c. *Bad Faith*

A covenant of good faith and fair dealing is implied in every insurance contract. Jordan v.

Allstate Ins. Co., 56 Cal. Rptr. 3d 312, 318 (Cal. Ct. App. 2007). An insurer breaches this covenant when it engages in "bad faith" by acting unreasonably or without proper cause in delaying or denying policy benefits. Chateau Chamberay Homeowners Ass'n v. Assoc. Intern. Ins. Co., 108 Cal. Rptr. 2d 776, 784 (Cal. Ct. App. 2001), *disapproved on other grounds*. "Bad faith does not lie with 'an honest mistake, bad judgment or negligence, but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." Tetravue Inc. v. St. Paul Fire & Marine Ins. Co., No. 14-CV-2021 W (BLM), 2018 WL 1172852, at *5 (S.D. Cal. Mar. 6, 2018) (quoting Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 726 (2007)).

Here, for the same reasons as stated with respect to Defendant's breach of the MJC Policies and potential breach of the Gree USA Policy, the Court finds that a genuine issue of material fact precludes summary judgment on Plaintiffs' claim for bad faith. See Chateau Chamberay Homeowners Ass'n, 108 Cal. Rptr. 2d at 784 ("[T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact . . . ."). With respect to the MJC Policies, the Court has found that Defendant breached its contractual

obligations by failing to provide an immediate defense upon receiving notice of the State Action in September 2013.  While Defendant did invite Plaintiffs to tender a claim under the MJC Policies on October 16, 2013 and April 1, 2014, Defendant was duty-bound to do more. The law is settled that an insurer "must defend a suit which Potentially seeks damages within the coverage of the policy."  <u>Gray</u>, 65 Cal. 2d at 275.  As discussed, enough information was provided to Defendant such that it was made aware that the MJC Policies would potentially provide coverage.  Thus, a jury may find that Defendant acted unreasonably in failing to provide a defense under the MJC Policies until May 27, 2014. <u>See</u> <u>Harbison v. American Motorists Ins. Co.</u>, 636 F. Supp. 2d 1030, 1041 (E.D. Cal. 2009) ("A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim.").

Similarly, the Court explained that a question of fact exists as to whether Defendant had conclusive evidence on October 1, 2013 that the Insured vs. Insured Exclusion applied under the Gree USA Policy. While there is evidence that Defendant conducted some investigation prior to pulling its defense, if the jury finds that Defendant did not have conclusive evidence that the Gree USA Policy did not cover the State Action

on October 1, 2013, then a jury may also conclude that Defendant's decision to withdraw the defense was unreasonable or made without proper cause. See Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 720 (2007) (citations omitted) ("[T]he insurer cannot deny the claim without fully investigating the grounds for its denial."). Because Defendant failed to identify for the Court all of the measures it took to investigate whether the Insured vs. Insured Exclusion applied prior to its withdrawal of coverage, Defendant has not shown that there is no triable issue as to whether Defendant's decision to withdraw was not in bad faith.

Thus, in viewing the facts in the light most favorable to Plaintiffs, a jury could find that Defendant breached the covenant of good faith and fair dealing. As such, the Court **DENIES** Defendant's Motion for Summary Judgment as to this claim.

### d. *Punitive Damages*

To recover punitive damages, a plaintiff must prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). "Oppression" includes "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights" and "malice" includes "conduct which is carried on by the defendant with a willful and conscious

disregard of the rights or safety of others." Id. §
3294(c). "Clear and convincing evidence" refers to
evidence that is "so clear as to leave no substantial
doubt." Shade Foods, Inc. v. Innovative Products Sales
& Marketing, Inc., 93 Cal. Rptr. 2d 364, 394 (Cal. Ct.
App. 2000) (citations omitted). While the same
evidence may be considered for both a finding of bad
faith and punitive damages, "the conduct required to
award punitive damages . . . is of a different
dimension than that required to find bad faith" and
evidence supporting punitive damages "must satisfy a .
. . far more stringent standard." Shade Foods, Inc.,
93 Cal. Rptr. 2d 364, 394 (citations omitted).

Plaintiffs assert that they are entitled to
punitive damages for several reasons, each of which
were previously addressed by the Court: Defendant's
denial of coverage under the Gree USA Policy without
conducting any investigation; Defendant's refusal to
pay 100% of costs of defending the Underlying Actions;
Defendant's structuring of the Settlement to use
Plaintiffs' Federal Action Judgment as an offset of the
claims Defendant was contractually obligated to pay;
and Defendant's conduct in lying and concealing the
true amount of remaining Policy limits. The Court
either rejected these arguments or concluded that a
triable issue existed as to Defendant's liability.

However, none of the actions alleged establish by clear and convincing evidence that Defendant acted with malice in denying Policy benefits.  See Neal v. Farmers Ins. Exchange, 21 Cal. 3d 910, 922 (1978) ("[W]e must look beyond the matter of reasonable response to that of motive and intent" in determining whether punitive damages are warranted); Slottow v. Am. Cas. Co., 10 F.3d 1355, 1361 (9th Cir. 1993) ("Put another way, punitive damages are recoverable only where the defendant acted with the intent to vex, injure, or annoy.") (citations omitted).  At most, the facts establish that the parties are engaged in a bona fide contract dispute, and there has been no showing that Defendant tried to take advantage of Plaintiff.  In this context, punitive damages are not proper.  See Slottow, 10 F. 3d at 1361 (rejecting punitive damages where the parties were merely engaged in a contract dispute with each side aggressively advancing its position, and the record did not support a finding that the insurer acted fraudulently).  Thus, the Court **GRANTS** Defendant's Motion as to Plaintiffs' claim for punitive damages.

e.  *Brandt fees*

Where an insurer acts in bad faith, the insured can recover attorneys' fees it incurred in order to obtain contract benefits under the insurance policy ("Brandt

fees"). <u>Brandt v. Super. Ct.</u>, 37 Cal. 3d 813, 817
(1985). <u>Brandt</u> fees are a component of damages which a
plaintiff must prove at trial. <u>Id.</u> at 819. An insured
seeking <u>Brandt</u> fees must plead and prove: "(1) the
amount to which the insured was entitled to recover
under policy, (2) that the insured withheld payment
unreasonably or without proper cause, (3) the amount
that the insured paid or incurred in legal fees and
expenses in establishing the insured's right to
contract benefits, and (4) the reasonableness of the
fees and expenses so incurred." <u>Jordan v. Allstate
Ins. Co.</u>, 56 Cal. Rptr. 3d 312, 324-25 (Cal. Ct. App.
2007). "The fees recoverable . . . may not exceed the
amount attributable to the attorney's efforts to obtain
the rejected payment due on the insurance contract.
Fees attributable to obtaining any portion of the
plaintiff's award which exceeds the amount due under
the policy are not recoverable." <u>Brandt</u>, 37 Cal. 3d at
819. "[P]laintiffs [] bear the burden of demonstrating
how the fees for legal work attributable to both the
contract and the tort recoveries should be
apportioned." <u>Cassim v. Allstate Ins. Co.</u>, 33 Cal. 4th
780, 813 (2004).

Defendant moves for summary judgment on Plaintiffs'
claim for <u>Brandt</u> fees because Plaintiffs failed to
identify the amount of <u>Brandt</u> fees it is claiming,

failed produce evidence of these fees, and failed to produce segregated billing invoices.  In response, Plaintiffs indicate that they "produced the invoices of Hanson [Bridgett][17] (along with more than 20,000 other pages of documents) which contain detailed descriptions of the work performed.  All the work was done prior to the filing of this lawsuit, so none was performed for proving bad faith."  Pls.' Opp'n at 35:25-36:2. However, Plaintiffs do not explain how HansonBridgett is relevant in this case, and do not inform the Court whether any of the work done to establish Plaintiffs' right to contract benefits was performed by them. Indeed, Plaintiffs insist that all of the work by HansonBridgett was performed before this Action was even instigated.  Further, the HansonBridgett invoices appear to contain work done with respect to other insurance companies, claims that are not covered by the Policies, and individuals not covered by the Policies.[18] The unsegregated invoices of HansonBridgett, reflecting

---

[17] Plaintiffs incorrectly refer to HansonBridgett as Hanson and Bridges.

[18] Plaintiffs contend that the invoices include work done with respect to other insurance companies because Defendant's coverage counsel insisted that other insurers who might also have to defend be notified of the loss.  However, Plaintiffs make no attempt to segregate these invoices for the Court based on recoverable fees incurred for this Action, even after Defendant put Plaintiffs on notice that they must segregate.

fees incurred by Plaintiffs prior to this Action being
instigated, are insufficient to satisfy the
requirements of Brandt.

Plaintiffs make an even lesser showing of Brandt
fees incurred by their current coverage counsel.
Plaintiff argue that they are not required to show any
documentary evidence of Brandt fees in contingency fee
cases like this one.  However, even if counsel in
contingency fee cases do not keep contemporaneous time
records, they are not exempt from apportioning the
amount of hours spent on Brandt-related work so the
trier of fact can determine which fees are recoverable.
Specifically, in Cassim, the California Supreme Court
identified a formula that should be applied to
contingency fee cases in order to determine the amount
of Brandt damages.  The formula requires that
Plaintiffs identify:

> [T]he total number of hours an attorney spent on
> the case and then determine how many hours were
> spent working exclusively on the contract
> recovery.  Hours spent working on issues jointly
> related to both the tort and contract should be
> apportioned, with some hours assigned to the
> contract and some to the tort.  This latter
> figure, added to the hours spent on the contract
> alone, when divided by the total number of hours
> worked, should provided the appropriate
> percentage.

33 Cal. 4th at 812.  Here, Plaintiffs' current coverage
counsel fails to indicate how many hours he spent
working on this case so far, how many of such hours

would be attributable to the contract recovery, and whether there are joint issues that should be apportioned.

Plaintiffs argue that Defendant could have taken the depositions of the attorneys involved to hear oral testimony of the amount of <u>Brandt</u> fees, but chose not to. However, since <u>Brandt</u> fees are an element of damages to be proved at trial, the burden rests with Plaintiffs to produce such evidence. <u>See</u> <u>Brandt</u>, 37 Cal. 3d at 819; In re Oracle Corp. Secs. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (holding that where the moving party proves an absence of evidence to support to the non-moving party's case, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial"). Because Plaintiffs have failed to identify, produce evidence of, or segregate its fees, Defendant is unable to answer the "key question" involved in ascertaining <u>Brandt</u> damages, "how much did it cost the insured—how much were her damages—to hire an attorney when her insurer acted in bad faith and denied the benefits due her under her policy." <u>Cassim</u>, 33 Cal. 4th at 809. Without this information, Plaintiffs have failed to provide evidence establishing their entitlement to <u>Brandt</u> damages as a matter of law.

Thus, the Court **GRANTS** Defendant's Motion on
Plaintiffs' Brant fees claim.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

# III. CONCLUSION

Based on the foregoing, the Court rules as follows:

(1) <u>Breach of the Gree USA Policy</u> – the Court **DENIES** Plaintiffs' Motion and **DENIES** Defendant's Motion

(2) <u>Breach of the MJC Policies</u> –

    (a) <u>Failure to Provide Immediate Defense</u> – the Court **GRANTS** Plaintiffs' Motion and **DENIES** Defendant's Motion. Plaintiffs may recover attorneys' fees they incurred in securing their own defense during the period of Defendant's breach, even if such fees exceed Policy limits.

    (b) <u>Failure to Pay All Costs</u> – the Court **DENIES** Plaintiffs' Motion and **DENIES** Defendant's Motion

    (c) <u>Failure to Pay Loss from Settlement</u> – the Court **GRANTS** Defendant's Motion

(3) <u>Bad Faith</u> – the Court **DENIES** Defendant's Motion

(4) <u>Punitive Damages</u> – the Court **GRANTS** Defendant's Motion

(5) <u>Brandt Fees</u> – the Court **GRANTS** Defendant's Motion

**IT IS SO ORDERED.**

DATED: June 4, 2019         /s/ RONALD S.W. LEW

                          **HONORABLE RONALD S.W. LEW**

                          Senior U.S. District Judge